Good afternoon, Illinois Public Court, 1st District Court is now in session. The 6th Division, the Honorable Justice Michael B. Hyman presiding, case number 24-0947 Harvest Food Group v. 4220 Kildare, LLC. Good afternoon. My name is Justice Michael Hyman. With me is Justice Carl Anthony Walker and Justice Celia Gamrath. You each have 20 minutes. If the appellant will please tell us how much time you wish to reserve for rebuttal. We'll conduct it as we would in the courtroom if we were arguing. And Mr. Hutchinson, if you would go first. Good afternoon, Your Honor. My name is Leland Hutchinson, and I represent 4220 Kildare, LLC, which with the court's permission, I will refer to as Kildare. I'd like to reserve four minutes for rebuttal.  This case is about enforcement. Mr. Shefferson, will you please introduce yourself just so we have his voice because this is being recorded. Absolutely. Good afternoon, Your Honors. Chad Sheffelbein from Vetter Price PC on behalf of the Plaintiff Appalee Harvest Food Group. Thank you. Mr. Hutchinson, the floor is yours. This case is about enforcing the agreement that the parties did make, which is a non-recourse structure limiting harvest total remedies to the agreed $2 million escrow, which was funded and dispersed. The parties also agreed to an award of attorney's fees only for enforcing the escrow agreement itself, which does not include harvest claims under the side letter. Mr. Hutchinson, you agreed, though, that both agreements provided that the escrow would not be – that there was – that placed no limit on what Kildare might ultimately owe to harvest. There was no limit placed on that, correct? There is language in both agreements which talks about no limit to the amounts being escrowed that might be claimed against the escrow agreement, and the word owed is used. But the escrow agreement does contain a termination provision that says that once the escrowed funds are dispersed, the agreement terminates, and that operates as a cap. There's no other way to really – It's my understanding – but it was always my understanding that the $2 million was not a cap on the escrow, that that was – that you still could end up owing more than the $2 million. That's how I understood everything. That's not how I understand it, with respect, Your Honor. I believe that what's happened here is that harvest agreed to accept the escrow agreement as its remedy. And even though the language that appears in those agreements – for instance, there's a parenthetical on page C-538 of the side letter which says, it being acknowledged that the rent escrow and relocation escrow are estimates and shall not limit the amounts that may be due from current landlord to tenant. But that doesn't set up a separate payment obligation. That sets up an ability for harvest to make claims against the escrow. But there is no method of payment here other than through the escrow. Well, they did make claims. They made claims against your client. Well, they made – well, except that what should have happened is that when the escrow agreement was fully depleted and the escrow agreement terminated, there was no requirement that Kildare refresh the escrow, and there's no requirement that Kildare pay anything directly to harvest. So even though harvest had expenses – You're still ignoring – that's also why the agreement provided for your client to maintain that $3 million of liquidity. Actually, no, Your Honor. That is an agreement that was reached with Scout, the seller. That $3 million of liquidity was to make sure that my client paid the contractors who actually did the repair work. And it has nothing to do with paying either harvest or Scout. They wanted to make sure that the contractors were successfully paid and the repairs completed, which did occur, and without any sort of liens against the property. So is that the ambiguity that you're referring to that's in this contract? Because you do refer to ambiguity. I don't think there is an ambiguity. In fact, the point here is that we have a clear termination provision that limits the payments under the escrow. We have no other funding mechanism to pay harvest anything other than the escrow. And to the extent that the court is going to imply, as the court below did, an additional obligation to pay them directly, that ignores the operation of the termination provision, which cuts off the amount of payments at the $2 million of the funded escrow. And so what happens here, you often have in contracts some provisions that are generous and some provisions that are limiting. I think the old phrase is the big print giveth and the small print taketh away, if you can permit me a little humor here. The point here is that there are plenty of provisions in these agreements. You want to be careful with your humor, Mr. Hatcher, because I'm not sure there's anything humorous about any of this. No, I'm sorry. I withdraw that. I guess that reminds me of what I also read in the record, where you responded at one time to them with some humor. As if this were all a joke. So you want to be careful with that, because you did that during the course of this negotiation. And as they brought to your attention what you owe to them, you interjected humor. And now you choose to interject humor here in the appellate court. So please be careful with that. I apologize, Your Honor, but what you referred to was not me. We are successor counsel. You're referring to prior counsel for my client. So I realize that I'm referring to counsel, period. So it's not just counsel, it's not just the counsel that engages in humor, but I guess also the current counsel engages in humor. And again, I'm admonishing you to please not do that again. I apologize. I withdraw the comment. What I will say, Your Honor, is that what the law requires is that the court below and this court attempt to construe all these provisions so they all have full force in effect. Now, there is an interpretation of the language which you cited about other amounts may be due. And that is that there are no caps on what Harvest could claim from the escrow. But there is a cap on the overall right to payment at $2 million. So let me ask you, I don't disagree that the funding mechanism is this escrow agreement. And then when it gets depleted, the question is, so what if indeed this tenant goes back to your client and says, well, after that repair period, we still incurred more costs and expenses. We're going to pursue them in court as they did. We're going to try to get a judgment against you, which they did. Maybe they get paid. Maybe they don't. It was a lot easier to get paid with the escrow agreement in place. But how does that prevent them from getting a judgment against your client if indeed the language of this agreement says you get the relocation costs, you get all of these things afterwards until this project and the repairs are completed? Well, but the agreement doesn't say that, Your Honor. What the agreement says is you may claim those amounts against the escrow without limitation. But the amount of the escrow is a limiting factor. The termination provision doesn't. So what language, what language specifically, which paragraph and which line of this agreement are you referring to? Well, I'm referring to the termination provision of the escrow agreement, which is 2.3.6, which basically says when all of the amounts have been, this escrow agreement shall terminate upon disbursement by the escrow agent of all of the escrow funds. If, in fact, there was an agreement that they get paid everything, that provision would not be there. There would be a provision refreshing the escrow agreement, or there would be an express provision for direct payment. But that is not what this says. This says that there is no payment mechanism after the escrow is depleted. But you're ignoring the question from Justice Walker that there is a mechanism if this happens, and that's called a lawsuit, which is what happened. So let's go back to the language that is the most important, and you centered on it. It's the parenthetical. This whole case really turns on that parenthetical. Would you agree? I would agree, Your Honor, and I would point out here that we cited Zapsky v. Maher, a 2011 decision from this court, in our brief that says an interpretation that renders a provision meaningless is not reasonable. And so the point here that I have is that if you have to try to interpret the parenthetical as not contradicting the termination provision of the escrow agreement. It doesn't, it doesn't, it doesn't, because what you're saying, first of all, you've already below has said that there's no ambiguity here. And it is an ambiguity. There is no ambiguity, because what it says in that parenthetical is it being acknowledged that the rent escrow and the relocation escrow are estimates and shall not limit the amounts that may be due from the current landlord to tenant. And then these important words, pursuant to this letter. So, what is happening is that anything that is more is outside this letter. And outside this letter, if you're not going to pay up, I mean, people, people money all the time and contracts, if they don't have an escrow, it never said it limits your reimbursement to the, to the escrow. That's nowhere to be seen in any document. And these are sophisticated attorneys. I would argue that the termination provision. No, it says pursuant to this letter. So anything. This letter doesn't affect any overage and again, your client was in charge of how fast is it going to be? And there was a 6 months and it took longer than 6 months. And you're saying, well, boy, we had the greatest deal in the world. We really put one over on them because not only did it take longer, and they were stuck. They had no relief except that there is that language there that takes it outside the agreement. So, if, if you wouldn't play up, then, then I guess that's what they did what they had to do. Well, if I may address that, your honor, this, the 2nd, full paragraph of the side letter says the escrow agreement shall provide for the current landlord's deposit of funds. And then it details what payments can go against those funds. That is the sole right that harvest had under this agree under the side letter to be paid through the escrow. No, no, no, no. That that's that's what this parenthetical says. No, the parenthetical says something different. It says that these are only estimates and maybe do from the current land to tenant pursuant to this letter. So pursuant to the letter. And so that's different than being dispersed. Then it goes on parenthetical to be dispersed by the escrow agreement. So, if everything is not dispersed. Everything's this person, there's no money left over and there's still something do it doesn't say that they don't have a right to bring a lawsuit. It doesn't say that they do. Well, if it doesn't say they do, it doesn't mean they don't. Why would a negative. Why we're in the law with that negative. I mean, you can't sue. Where's the say they can't sue. Well, they can only sue if they have a right and what they agreed to. Well, you and I may differ on this, but what they agree. I'm just asking questions. I'm not sure. But what they agreed to was to accept the $2M is the total amount. Now, where's the say that where I mean, you have to interpret that it doesn't say that it does. Well, the termination provision operates that way. Well, but by operation, but that doesn't mean they don't have again. We are talking about a lawsuit the way that they are recovering. This is by lawsuit. It doesn't say they can't sue. It doesn't say they go to arbitration. It doesn't say anything about that. Let me turn to my 2nd issue briefly about the attorney's fees. Let me ask you about that. Even if this escrow agreement terminate. Once the money is just 1st, doesn't this letter agreement still survive. And the letter agreement does survive, but there's no attorney's fees provision under the letter agreement. Okay. But isn't there a provision about amounts do. There is, but not for attorney's fees. Okay. But just as I was asking about that, what happens when they're still amounts do and the escrow agreement is over because the $2M has run out. And there's still amounts do doesn't this letter agreement. Give them the right to come after a client to recoup. What's do even if it's not an easy way to get paid. They still could get a judgment. It's our, it's our position. Your honor that it does not because we believe the parties agreed to a non recourse structure. And perhaps say that because I've seen plenty of agreements that do talk about non recourse recourse loans. I've seen provisions in contracts that say, this is your soul and exclusive remedy. Don't go knocking on the courthouse doors. Tell me and point to us where we could construe that language that you're asking us to find. It's our position that determination provision operates in that manner. Say it. That's that's the answer to the question is, if there's nowhere in the agreement, it doesn't state the determination provision is the sole language I'm pointing to. So there's no non recourse language. So if I could, if I could turn to the government. Another question. If there are other questions I'm happy to respond to them. Just so now you're about to tell us why they shouldn't get attorney fees because the escrow agreement terminated, and this letter agreement still survives, and there's no fees in this letter agreement. Is that what you started to say. It is your honor with a slight distinction that it's not because the escrow agreement terminating the escrow agreement section of 4.10 provides for attorneys fees for any legal action brought for the enforcement of this escrow agreement. But it also states in all other matters arising here under each party shall bear its own attorneys fees. If, in fact, they are asserting the right to collect under that language of it being acknowledged that other are that these escrows are estimates in the side letter and that other things may be due. They're clearly collecting under side letter promises and not against escrow agreement promises. Well, wait a minute. Wait a minute. That's not what this says, though. Isn't the side letter incorporated with the escrow agreement? Are they incorporated together? No, your honor. They are not. They're merely referenced. They're not incorporated. I don't believe so. It's only reference you say it's. I'm pulling up the escrow agreement right now. Let me make sure that I'm like, it could be in the side letter to. So, 4.12 of the escrow agreement says the foregoing recitals are incorporated within and made an integral part of this. Are the recitals. The recitals is where the letter agreement is referenced. And now we have a provision that says they're incorporated. That is there, but your honor that the parties separated out in section 4.10 claims to enforce the escrow agreement itself versus other claims. My position here is there could not be an interpretation of 4.10 that leaves the any other matters entirely blank that nothing would ever fit there because the parties made two categories. There have to be two categories. If this court's going to enforce the intentions of the parties. So. Even if there is incorporation. Of the other agreement into this agreement. You would at least have a conflict with the creation by the lawyers here. Of two categories of claims, one of which gets fees and one of which doesn't. And this can you know there's there's never been any claim that the escrow agreement was improperly terminated. It was improperly performed or anything else. So, the claims here that harvest is bringing are entirely related to the promises in the side letter that we've been discussing and not to the attorneys fees provisions of the escrow agreement. Those are very narrow and this court should enforce the intentions of the parties to have two categories. And unless there is some promise. That fits in the all other matters category, which doesn't warrant fees it you can't merely bring everything in by reference. What about in the side letter? It does say specifically that they have no recourse. At all to collect anything from the. Future landlord, correct? That's right. Okay, but it doesn't that again. There is nothing that says that that would mean they would have to sue him when they if. Since there's nothing in the escrow, they would have to sue them, but they're saying you can't sue them for anything. And as to your client, there is no such language in the side letter or anywhere else. With regard to future litigation, but they're specifically with regard to the future landlord, which shows a difference intent. Could that be a reasonable interpretation? It might be. Okay. I think your time is that you still have your 4 minutes, but thank you. If there are no other questions, I rest. Okay, may I ask you a question? We're here on a summary judgment motion. That means that this is Mr Hutchinson. Yes, it is. So, no genuine issue of material fact as to anything. Are we correct that if we believe that the trial judge was correct in interpreting these agreements that there is no dispute as to the amounts. So, in other words, if you lose on the substantive issue and interpretation of these agreements. Was there any issue of fact pertaining to the amount of the attorney fees or the amount of the judgment of the 1.9. To be to the contrary, your honor, I believe there are many factual disputes, which we've argued in our papers about both the damages and about the interpretation of this language. So, skipping in the interpretation of the language. Are the are the numbers undisputed and. And if they are disputed, what evidence came in to dispute these numbers. Well, let me look at the. Statement of facts of our appellate brief. We made a record. Supported factual argument that the repairs were substantially completed by April 29, 2002. And the racking was reinstalled by April 30th, and that changes the damages number substantially. And that's shown until there's opposition summary judgment at 4, which is C730. That's 1 example. 1 example, but you also agree that there was, they could not move back into a code storage unit. That was not a cold storage unit when they moved out. It was a cold storage unit when they, when they did move back in until it was once again, a cold storage unit. I would agree with that your honor, but the judge asked me if there were factual issues that require the preclude summary judgment and there are. Well, you still haven't told us what those are. I have they claim that they were kept out of the unit until June and we claim they could have gotten back in the unit on April 30th. And there's a substantial dollar difference between those 2 dates. Well, they couldn't get back in the unit and use it as they were using it before before they were kicked out. Well, we claim we did make a record supported factual argument that they could have gotten back in on April 30th, 2022, which is appears that our opposition is summary judgment at 4 at page C730. We argued it in our main brief in the factual circumstances and there's also a, you know, we, the 2nd argument of our main brief is a genuine issue material fact argument that goes from page 17 all the way over to page 22. What about the attorney fees for the attorney fees disputed. Well, the, the availability of them were, I'm not sure that the amount of them were. So, again, if we disagree with your substantive position on the attorney fees is the attorney fee number that was awarded. Well, if I'm, I'm not sure I have any evidence reflecting that that was disputed on the facts, but if, in fact, there's a genuine issue of material fact about the amount of damages, then obviously the attorney's fees award would have to be reversed and remanded with everything else to be reconsidered in the initial instance by the trial court. Why, why we remand on discrete issues all the time. Because the summary judgment would not be appropriate until the damages are shown by evidence. If there's a genuine issue of material fact. As to damages as to the amount of damages. Yes. Any other question. No more question. Thank you very much. Thank you. You may proceed. Thank you. Good afternoon may please the court. My name is Chad sheeple buying a better price PC on behalf of the plaintiff happily harvest food group if it's okay with the court I'll refer to harvest food group is harvest and 4220 killed their LLC is killed there. This is a simple breach of contract dispute. The circuit court was correct to enter summary judgment below. Where's the contract, where we've been arguing. Where do you have the ability to collect outside of the escrow. Well, and the escrow agreement incorporates the side letter agreement as your questions as the court's questions had alluded to. Use the word incorporate I use the word incorporated. And Mr Hutchinson said it did not. He said it referred to it as opposed to incorporate it, I just want to states that it's attached and this is preamble recital see. And it says this, the side letter agreement attached here to schedule one so it's attached to it. And then as Judge cameras had pointed out in section 4.2 4.12. It states recitals incorporated the foregoing recitals are hereby incorporated within and made an integral part of the of this escrow agreement as a fully set forth here in. So those are the two agreements that we had sued upon incorporating Okay, thank you. And then, and then the circuit court correctly applied the summary judgment standard with no just genuine issues of disputed fact awarded us judgment. I know, but the question was the contract, where is this, where are you get to get more than the $2 million when that's escrow is depleted. I believe it was your honor had pointed out to the parenthetical that says that these are going to ask the question I want to hear from what your argument is. It is, it is in the parenthetical where it states that these are estimates they're not limited, and may I also point out to the court. I understand that there's different counsel killed their replaced its counsel, when it took this up on appeal. But I will refer the court to the record at C 766. This is the response to the summary judgment motion. And I quote at the top of the page, while the escrow agreement and side letter agreement each provided that the escrow funds were not a limit. That is the position that they took below and now they're saying, oh, it is a limit. It's capped at 2 million. That's not supported by the plane and unambiguous language of both the side letter and the Mr.  Chief of mine. There wasn't the limit. They're saying that the, that you can't get more than the escrow unless you decide to take some other action, or unless you took further action. I think I think it's either more than that, even if they took, you can't take any action. I think that was part of Mr. Hutchinson argument, but he went back and forth on that. Right. And then I think he conceded the point that there was the no recourse language that did not apply to his current landlord, which is his client. And so what the way that this all came about, if I might just back up for a second. And it's in the pleadings, it's in the record, but the way that this all came about is Kildare went to go sell the property located at 4240 to 20 Kildare in Chicago cold, cold storage facility, as you pointed out, Judge Walker. They sold it to scout. They sold it for almost $95 million. In order to consummate that sale they needed to make repairs to the, the area we leased, which was commonly referred to as sweet why it's about 180,000 square foot cold storage facility that stores food, you can't store food outside a freezer, bad things happen. In order to consummate the sale they came to us and said, listen, we're going to sell this property to scout for 95 million, but we need to make repairs we need to take up the whole floor the glycol system the whole thing because it's, it's a freezer, and you've got concrete and then you've got to go down into the earth and repair all this, and we need you to enter into this side letter agreement and this escrow agreement. Because scouts telling us, you harvest, you're going to continue to pay rent suite by rent that is defined in both the side letter agreement and in the escrow agreement. And you're going to have to get out. And you're going to have to go through logistics and hire other places and go store your food somewhere else. Why we make this repair so that we can sell this building, and then eventually make $95 million. Now, the parties had set it up thinking it would be a six month process until December 4 of 2022 or 2022 that didn't happen there were delays and those delays were not our fault at all. And ultimately we did not get a freezer back until July 5 2022. Now, by then, the escrow had run out. But as the parenthetical states in both those were estimates the parties were estimating of as to what they would need to get them through the construction. And then all of a sudden the escrow ran out and killed air said, not going to pay anymore. And we have in the record scout says hey, you got to pay you're already 810,000 in arrears, they're paying us rent you're supposed to reimburse them under the side letter agreements. And then the response was, at one point, let the big let the games begin. And then later when we said to him, this is guys this is serious we're in to seven figures here. You are hurting our business. We did this to accommodate you so you guys could make $95 million. We're now 1.4 in the hole. And we need to get back in we don't we don't like not being there right it's a logistical nightmare for us, we would like the place that we're paying for. And we want to get back in as quickly as possible. And the response behind the scenes was, and again it's not Mr. Hutchison, but it was ba ha ha ha. And they paid nothing. And then when we asked him why did, why did you pay nothing they had no excuse to go. Yeah, just because we didn't believe me. But that's an important point at the depositions. There was, you had sent the monthly invoice I mean they're, they never objected to the amounts. And, right, they just accepted everything and then pay. And they never told you why they didn't pay. And they just led you on and on and saying we're coming we're getting there we're getting there. And then what happened. When you move back in I mean you had all this money and that's when you brought suit. Well, yeah, we were out all this money we were out $2 million. And then we brought suit and they came to us as the lawyers and said this is this is crazy. We did this gentleman, I mean there was two gentlemen that own it. It's a single purpose entity so once the property is sold and once they get the funds if the funds go somewhere. We're left with a shell, we have nothing to go after their judgment proof. So that's why you have that $3 million in there. It goes to both the buyer, which was scout as well as us it wasn't just the trades it was to protect us. Once that 2 million ran out which again we're just estimates as per the parenthetical in both agreements. So they came to us and then we got into the back and forth and said we don't want to sue we just we want our place back. We've done what we were supposed to do. We satisfied the conditions preceding we paid our rent scout acknowledged in deposition that we paid our rent. And we incurred all these costs and we're sending you the same spreadsheets that we sent to you guys before you're familiar with them. We had no problem when there was 2 million in escrow and the only thing that changed is now you got to come out of pocket and you don't apparently want to come out of pocket. But I'm Justice Hyman as as to your question. No, they never had an expert come in and refute. They deposed Miss water who's our VP of finance and accounting. She worked for a big accounting firm. She's a CPA. She was capable and knowledgeable and she was the same one who was sending in the detailed spreadsheets and communications that were reimbursed by the escrow agent. So it's kind of a simple dispute in that we did somebody a favor and we we said, hey, we'll accommodate you so you can make this sale and congratulations. You've made 95 almost ninety five million dollars. And then on the way out, we get punished for good deeds. And and that we're out one million nine hundred and change. And so tell me tell me about that one point nine. The evidence in the record versus any questions. Fact as to that one nine being disputed. Well, there was two arguments that they tried to make that the circuit court rejected. One was this substantial completion date. They couldn't get the date, whether it was April 29th or April 30th. The record reveals that that was concocted by the prior counsel. It was not substantially completed in the record. If you can imagine this freezer, a giant freezer, one hundred and eighty thousand square feet plus. Right. So you have racking, which is basically industrial size shelving. These guys took our racking and they showed it outside for the Chicago rodents and bugs and everything else for a year. And then they said, oh, we installed it. We said, well, we're in the food business. We're not going to put our food on something that's sorry, been outside for a year. We got to wash it. We got to clean it. That didn't even get in until April 30th. And so that substantial completion argument, that's not correct. Plus, we were supposed to be put back in a freezer. That's what we were paying for. And that temperature did not get lowered until July 5th. And we have no there's no incentive for us to drag this out. Right. Because we're trying to go to different places. And so just let me ask you, just pause for just a second. Can I ask you about this? So what you're saying here is that the property was not in any condition for you to be able to move back in until that July 5th date. Is that correct? That's correct. And then there was an argument about that. They didn't argue that they never argued that the property that you could actually move. Yeah, because it was not a call for June until July 5th of 2022. I'm very sorry you were slightly breaking up. Could I indulge you to repeat that question? I'm sorry. I was asking whether that was correct that this property wasn't. Not a cold storage unit. And July of 2020. I believe that your question was this property was not a cold storage unit until July 5th of 2022. Yes, that's correct. And I'm sorry, I'm not sure if it's on my end, but justice Walker's video feed was frozen there for a minute and I apologize if I missed anything. You answered his question. Okay, thank you very much. So, it's not we had no incentive of dragging this out. We had every incentive of getting in. So, justice Walker's frozen right now. So I'm going to ask a different question. I'm going to ask about these attorney fees. The attorney fee provision in 410 pertains to breach of the escrow agreement. We've talked about your position that the letter agreement is incorporated. Not merely reference, but then we do have this termination provision in 4.3. Oh, no, excuse me, but termination. Provision that says once the money's gone, it. It's over that's 2.3.6. So, if the escrow agreement ends. And there's no breach during that time, because they paid the 2 million. How do you get fees. There was a breach that they stopped paying prior to. There was notice that they were not paying right up until the time that the escrow agreement ended. The escrow agreement ended and discharged the escrow agent, but it didn't extinguish then existing ongoing obligations, including but not limited to the obligation to continue to reimburse us for suite Y rent and relocation costs. Also, there was some there's other provisions in there that would survive, like the indemnity provision. So, if the escrow agent came and said, you guys need to indemnify me for something, they couldn't just say up to bed. So, sorry, the clock rang 12 and we're done. And that's the argument that they're trying to make here. And then, with respect to the fees, just to clarify. In response to your questions to Mr. Hutchison, the way that the circuit court had set up the attorney's fees was that they're judge basic has an order that says, submit your fees. And there's, you know, he's already determined that they're available, but then you can argue about the rates and the amounts and the billers and things like that. And what he forces the parties to do is to have those arguments outside the court. What that resulted in was an agreed order to the amount of fees and costs after that. So, in answer to your question, judge, the amount was agreed to and submitted pursuant to an agreed order as per the circuit courts attorneys fees provision procedures. And what about damages? What about this 1.9? Was there any similar procedure? Was there any robust argument with evidence to say their 1.9 is wrong? Even if we take that date of July 5th, they still didn't incur that much in relocation costs and so forth. No, there was no meaningful response or rebuttal to that. There was no expert on the other side. I would note that Ms. Wanner was deposed by former counsel. She walked through the spreadsheet that was submitted in part of the record. I would also note that the suite Y rent is fixed by the lease. So that's not open to debate. That's just a, shall we say, a liquidated amount. And then the rest of the costs or, yeah, the relocation costs, they were similar nature of to what was already being reimbursed. That's why Mr. Daly couldn't answer a question at that position. He says, I just don't believe you're entitled to it. We're not incurring any any different costs than we had occurred starting back in June of 2021 when we had to be relocated. So he could make repairs to the floor in order to sell the building for ninety five million. So there's no way that they could. It was the same continuation. This is just we're out another month. Here's another month of rent reimbursement and relocation expenses. And that continued on until July 5th. As Judge Walker said, that's when Merck or noted that's that's when we got our freezer back. Before that, we couldn't move back in. So in conclusion, we would respectfully request that the court affirm the circuit court's judgment on all accounts, the prejudgment interest, which is statutory, the attorney's fees, which were agreed to at least in amount and post judgment interest and attorney's fees on appeal. And unless the panel has any additional questions, I want to thank you on behalf of myself and Harvest for the opportunity, time and consideration. Mr. Hutchinson, you have four minutes. Thank you, Your Honor. I want to make a few brief points, one of which, if if, in fact, counsel's argument about the side letter being incorporated into the escrow agreement is valid. Why did they not object to the escrow agreement terminating in the spring of 2022 after all the payments have been made? They never made any argument below about the fact that that termination was improper or that there was any continuing obligation under the escrow agreement or anything else of that nature. They simply proceeded to say, Mr. Hutchinson, isn't it correct that the escrow funds were with, I believe, first American title? I believe it was. And that's called Greenwood had terminated their first American title. Couldn't dish out any more money than what was placed into the escrow. That's exactly right. So for you to say that they didn't object to the escrow agreement coming to an end, there was nothing they could do. The escrow agreement was done because all the funds had been liquidated. On the contrary, your position first American title was not going to start using their own money to start paying anybody. And that's not what I'm arguing to distribute. That's not at all what I'm arguing. Counsel says that there were additional obligations under the escrow agreement for them to be paid by Kildare that because of the incorporation. That's the point I'm addressing here. I'm there were and there were. And that was the whole purpose of the three million dollars that were required to be placed into a fund by your client. Your Honor, there's nothing in the record that says that my client did not have the three million dollars available or breached that promise. They were never asked to to show the three million dollars by anybody that never came up. There's nothing in the record to support that that position. So, in other words, even though the agreement provided that your client placed this these this three million dollars into a separate account to show that they have liquid funds available, they never did. And is that what you're saying? The agreement did not require that the funds be placed in a separate account. Your Honor, the agreement provided that if my client was asked by either scout or harvest to show that they still had a three million dollar net worth, then they were required to show it. The two points I'm making is they were never asked and they never failed to show it. So, so, so what that they that they trusted that you did have liquidity because as we've heard 10 times, they were going to sell a building for 95Million. So, there might have been a presumption that you had 3Million, but you mentioned during your original argument that this 3Million pertained to. To your client and scout and didn't have anything to do with Kildare. But it did what I'm my position on this is that the 3Million was to ensure that the people doing their repair work actually got paid and there were no mechanics liens on the property. Why, why should we think that's correct when it's in the letter agreement, strictly between Kildare and a harvest. It's not scouts agreement and it says throughout the completion of the repairs, all applications of the current landlord. And then it talks about the tenant, which is Kildare and I'm not seeing anything about the future landlord in that paragraph talks about current landlord and it talks about tenant. There, but the. The continued viability provision was a promise made both to harvest and to the current than future landlord. And the reason it was made was to ensure that the repairs got completed as shown by the language that we cited in our brief coming from the promise to scout. But what does it matter? It doesn't matter. It is that it has nothing to do with the issues here. What relevance does that have? I'm merely I'm merely citing it to say that it is it is not an indication that we made a promise to pay scout to excuse you to pay harvest directly. Well, except, except, you know, it could be read that way. And your argument to say, no, this was really because of scout scout is not mentioned in that paragraph at all. No, but there is a similar as we showed in our moving papers in the briefs. There's this identical agreement with scout in which they have it. It's referenced. I believe in the escrow agreement, which scout is a party to. I'll find it for you. I mean, I mean, it there's nothing in the record that you're making an argument. All you're doing is there's nothing in the whether any testimony to what you're telling us. It wasn't a main issue. No. So it really. Okay. And again, the, the, the other point I would make in rebuttal. And this is just what Mr Schieffelbaum stated. He made up an argument that are substantial completion date was quote concocted. Now, that's a factual determination that only a jury can make. He has admitted. I would suggest to you that there are genuine issues of material fact about the extent of the damage period. And then even if you disagree with me on everything. Are you referring to the repair period? You may have misspoke. No, I'm talking about the period in which they're entitled to damages after the repair period concluded. Your Honor. Are you telling us that you, your client disputes that they couldn't that it was not ready. That is, it was not to the temperature. It had to be until July 5th. Is that what you're saying? That fact you're disputing that fact. Where did you just. We have made an argument, as I mentioned in in our opposition to summary judgment that the substantial completion. You may have made that argument. But where, you know, the judge made findings that you put on where is there any question that they could not move in before July 5th. I mean, you're saying that it was cold enough to move in. Is that you're disputing that I just want to. There is a dispute is to the date and that gives. How could they move in? You agree they couldn't move into the temperature is right. I don't know that that's the case. You're on it. It's not clear on that. Well, Mr Hutchinson. Once you are presented with a motion for a summary judgment on that saying the completion date was July 5th. Then it's up to you to respond and create a genuine issue material fact. Just saying so doesn't create the material issue. I totally agree your honor, but we did make a record based argument that the completion date was earlier. What's in the record? What's in the record to tell us April? Well, I don't have that in front of me, but I do know that we made that in opposition of summary judgment and the court below rejected it. But that's still a question of fact for the jury and not for the court to decide is my point. One final question I have is going back to the side letter. The last paragraph says the whole paragraph is about. The tenant confirms that it will have no claims against future landlord and it goes on for specificity again. There's no recourse here, which we've already decided and there's nothing anywhere here that says that. Harvest has no claims, cannot bring a claim against their client. That is just arguments that you're trying to. Sketch together from that one parenthetical. Is that correct? My position your honor is that the only interpretation of these agreements, which does not have internal conflicts and thereby violate the rules of contract construction is that the termination provision acts as a gap. Despite this other language. Otherwise, you've got an internal conflict and you've at least got a genuine issue material factor requires extrinsic evidence as to the parties intentions. That's got to be heard by a jury. How do you say that when you say there was no below you said just the opposite. It says parties thought that this was not that there was no genuine issue. Excuse me that that there was no. Ambiguity, but the argument now being made that there's a payment promise, despite the termination provision raises that ambiguity for the 1st time on appeal. That wasn't raised below. You're saying I don't believe it was. I think that there was not. Did you say that in your brief. I mean, they raised something in the reply brief. Are you saying no, no, no, no, no, no. Their position is that there is a continuing obligation to pay. There was not a lot of focus below on the meaning of the term. That's not their fault. This is what we did make the argument and the court below ignored it. All right. Thank you very much. Thank you. Thank both sides. Thank you. Very brief. Thank you for your arguments. Appreciate it. It was a full discussion of of the issues and you are both very well prepared. So I appreciate we all appreciate that. We'll take the case under advisement and we will have a decision forthwith. Thank you much. Thank you very much. Have a nice weekend.